UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 22-cr-592 |
| ) | |
| v. ) | Judge Sharon Johnson Coleman |
| ) | |
| MICHAEL K. JONES ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Michael K. Jones has been charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Chicago police officers seized a Glock .40 caliber fully automatic pistol with an attached conversion device after a search of Jones's car. Jones moves under Fed. R. Crim. P. 12(b)(1) and 12(b)(3) to quash his arrest and suppress the evidence obtained during that search. For the following reasons, the Court grants Jones's motion [30].

**Background**

The following facts were established by the evidence presented to the Court at the evidentiary hearing and through the parties' briefing.

Chicago maintains "POD cameras" throughout the city, especially positioned in "high-crime areas." The POD cameras stream to the Chicago Police Department's Strategic Decision Support Center ("SDSC"). SDSC uses the cameras to provide law enforcement teams real-time support and create and preserve evidence. The cameras have a wide range of view, meaning they can rotate 360 degrees and zoom in and out. SDSC observes the cameras at all times and can follow suspects as they travel across multiple POD cameras. SDSC is the department's "eyes in the sky."

The facts of this case begin on April 23, 2022, when the "eyes in the sky" were monitoring Jones and a small group of African-American men gathered outside around 10001 S. Wallace St. in Chicago's 22nd District. The POD video depicts the group talking and laughing in broad daylight,

1

with no sign of criminal activity. Nevertheless, SDSC Officer Carlie Bandyk viewed that particular POD camera because it was positioned in a "high crime area." Officer Bandyk did not testify in this case. The only evidence of her statements comes from her interview with the U.S. Attorney's Office. During that interview, she reported that she "observed a subject with what appeared to be a gun inside his left waistband. The POD video obscures a full view of Jones for most of the clip. When he emerges from behind the group (for only a few seconds), Jones appears to have a bulge under his waistband and white t-shirt, but the bulge is ambiguous in shape and the color is masked by Jones's clothes.[1]

      Officer Bandyk believed that the bulge was a gun. Based on this suspicion, Officer Bandyk continued to observe Jones as he entered a red Toyota Camry with the Illinois license plate CX64256. Officer Bandyk does not recall whether she ran the license plate or not, but doing so would have been standard procedure. Officer Bandyk also does not recall whether she checked who the registered owner of the vehicle was, or whether that owner had a suspended license. Again, however, she says "that is the type of thing she often checked in similar incidents." Officer Bandyk does recall calling Chicago Police Officer Josealejandro Pickett—who along with Officers Carlos Ponce and Luis Nunez was patrolling the 22nd District as part of a tactical team—to report "that she observed a man with what appeared to be a gun near 10001 S. Wallace St." She recalls providing the suspect's license plate number, real-time location, and physical description, but does not recall whether she provided any additional information. Officer Bandyk tagged the POD video to preserve it, and the government submitted that video as Exhibit 5 to its response brief. (Dkt. 34.)

---

[1] The government submits a freeze frame of the POD video that they argue depicts the handle of a gun. But the Court notes that these screenshots are paused at a specific microsecond and zoomed in. The Court was unable to recreate these screenshots in its first few attempts at pausing the video even with the benefit of a time stamp. Officer Bandyk does not report seeing a gun handle in her interview, and the Court does not believe that she could have made out a gun handle in real-time in the POD video presented.

Officer Bandyk spoke on the phone with Officer Pickett. Officer Pickett says Officer Bandyk reported to him that the Camry's owner had a suspended license. Officer Nunez did not remember who in his squad car was communicating with SDSC but testified that he understood SDSC ran the Camry's license plate and determined that its owner had a suspended license. Officer Ponce did not testify, but reported in his interview that "Officer Bandyk was able to inform Officer Ponce's vehicle that the registered owner of the vehicle had a suspended license." The officers also state that Officer Bandyk's search returned that the Camry's owner was an approximately 30-year-old male. The officers did not know whether the Camry's owner had a Firearm Owners Identification Card ("FOID card") or a Concealed Carry License ("CCL"). No officer knew whether Jones was the registered owner of the Camry.

Officer Bandyk continued to provide the officers with real-time information on Jones's whereabouts as she tracked the Camry through various POD cameras. Officers Pickett, Ponce, and Nunez caught up with the Camry as Jones was exiting the vehicle roughly two miles away from the original POD camera where Jones was seen talking casually to other young men in broad daylight. The parties agree that Jones was not stopped for any other traffic violations and that the Camry was parked legally.

The officers' body worn cameras ("BWCs") captured the rest of the encounter. Officers Ponce and Nunez apprehended Jones a few yards in front of the Camry and immediately placed him in handcuffs. Officer Pickett quickly scanned the car for other passengers but could not recall if he saw a gun in the car at that time. Officer Nunez then took Jones's car keys and went to the Camry. Officer Nunez's BWC shows the Camry's windows are tinted, but Officer Nunez testified that he could see through the tint in the window and that he has a larger field of vision than his BWC depicts. Immediately upon approaching the driver's side of the Camry, Nunez testified that he observed the handle of a gun with a Glock "SEAR" switch in between the driver's seat and center

3

console. Officer Nunez did not include any reference to a "SEAR" switch in the police report drafted that evening. Without any pause, and while his BWC faced the back of the car, Officer Nunez opened the driver side door immediately after arriving at the car. He then retrieved a gun from between the driver's seat and center console. After Officer Nunez revealed the gun, Officer Ponce asked Jones if he had a FOID card or a CCL. Jones said he did not have either and Officer Pickett told Jones that he was under arrest.

All three officers' BWCs captured audio. No officers' BWC captured any mention of a suspended license. Indeed, Officer Ponce's BWC captured the following exchange between Jones and Officer Pickett immediately after Officer Pickett told Jones he was "under arrest for possession of a UUW":

> **Jones: What? Why did y'all just pull on me, though?**
>
> **Officer Pickett: How did we know – we had – you had a gun.**
>
> **Jones: Why though?**
>
> **Officer Pickett: Because…**

As Officer Pickett trailed off, he shrugged, put both hands up near his head, and dismissively gestured his hands.[2] He did not say anything to Jones about a suspended license and walked away.

At the evidentiary hearing, Officer Pickett gave a different reason for the initial detention:

> **Q: Okay. You then park your car in front of [Jones] with the intention of detaining him, correct?**
>
> **A: Correct**
>
> **Q: And you're detaining him why?**
>
> **A: Driving on a suspended license.**

(Tr. Vol. 1, 42:24-43:3.)

---

[2] The Court recommends that the reader watch the video to understand this description. The exchange is depicted in the government's Exhibit 8, Dkt. 34-8 at 2:20-2:40.

After Jones was placed under arrest, and after he was read his *Miranda* rights, Jones confirmed that he was the registered owner of the Camry and that he did not have a valid driver's license, FOID card, or CCL. The officers confirmed Jones's suspended license through the Illinois Secretary of State database, and Jones's vehicle was later towed and impounded.

**Discussion**

The parties dispute whether the officers' first contact with Jones constituted an arrest or an investigatory *Terry* stop. Jones further contends that the officers lacked even the "reasonable suspicion" required to conduct a *Terry* stop. Because the "reasonable suspicion" required for a *Terry* stop is less than the "probable cause" required for an arrest, the Court begins with assessing whether the officers conducted a lawful *Terry* stop.

1. Terry *Stop*

Not all interactions between police officers and citizens require probable cause. It is well settled that police officers can stop and detain people for certain investigatory purposes. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To conduct a *Terry* stop, police officers must have a reasonable suspicion, supported by articulable facts, that criminal activity has or is likely to occur. *Id.* at 21–22. Reasonable suspicion requires something less than probable cause but more than a mere hunch. *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011). Whether an officer has a reasonable suspicion is determined based on "the totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). The officers involved in a traffic stop need not be personally aware of all the "specific and articulable" facts justifying the stop, so long as a law enforcement officer who is aware of such facts relays his or her reasonable suspicion to the officers effecting the stop. *United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992).

5

"The reasonableness of the stop is based on an objective standard: 'would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?'" *Bullock*, 632 F.3d at 1012 (citation omitted). The government bears "the burden of establishing by a preponderance of the evidence" that the officers had the reasonable suspicion to conduct a *Terry* stop. *United States v. Longmire*, 761 F.2d 411, 418 (7th Cir. 1985); *see also United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014); *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). The Seventh Circuit has explained the reason for this burden as follows:

> Like a warrantless arrest, a *Terry* stop has not been judicially sanctioned; there can be no presumption of legality. And, because the police have not sought judicial approval, no affidavit to which the defendant would have access sets forth the basis for the reasonable suspicion. The facts allegedly constituting the reasonable suspicion are peculiarly within the knowledge and control of the police. To require the defendant to prove the absence of a reasonable suspicion without knowledge of the facts upon which the police based their assessment of the existence of a reasonable suspicion is to place upon him an impossible burden.

*Longmire*, 761 F.2d at 417.

Here, the government argues that the officers had reasonable suspicion that Jones (1) was driving with a suspended license and (2) illegally possessed a gun. The officers' justification has shifted in important ways since the search. Therefore, mindful that it must review the "totality of the circumstances," *Baskin*, 401 F.3d at 791, the Court addresses each justification in turn.

    a. *Suspended License*

As the government points out, the Supreme Court has recently held that seemingly identical circumstances supported a *Terry* stop. *See Kansas v. Glover*, 140 S.Ct. 1183, 1186, 206 L. Ed. 2d 412 (2020) (holding that license plate search showing that a car's registered owner's license is revoked, without further "information negating an inference that the owner is the driver of the vehicle," supports a reasonable suspicion that the driver is the unlicensed owner). But this case differs from *Glover* in at least one essential way. In *Glover*, there was no dispute that the police officer making the

*Terry* stop knew that the owner of the car he stopped had a revoked license at the time of his stop. *Id.* at 1187. The evidence and testimony in this case do not support that the officers knew the Camry's owner had a suspended[3] license at the time of their stop, rather than after. *See United States v. Lee*, 300 F. Supp. 2d 632, 636 (N.D. Ill. 2004) (Gottschall, J.) ("The question whether the officers here had reasonable suspicion to detain [defendant] hinges on the information available to, and the reasonable inferences made by, the officers at the time of the stop. The officers' post-hoc assumptions regarding [the defendant's] conduct are not relevant to that inquiry.").

The tactical officers knew only the facts that Officer Bandyk relayed to them. The Court therefore addresses this case under the collective knowledge doctrine. "As articulated by [the Seventh Circuit], the [*United States v. Hensley*, 469 U.S. 221, 232–33 (1985),] collective knowledge doctrine requires: (1) that the officer effecting the stop act in objective reliance on the information received; (2) that the law enforcement officer providing the information had a reasonable suspicion to justify the stop; and (3) that the stop conducted was no more intrusive than would have been permissible for the officer requesting it." *Nafzger*, 974 F.2d at 911 (citation omitted).

Because the officer who supposedly ran the license plate does not remember whether she did so, the only evidence that the tactical officers knew the Camry's owner had a suspended license is based on their post-hoc police report, interviews with the U.S. Attorney's Office, and in-court testimony. Of course, that kind of evidence is not unusual. In this case, however, those statements must be put in context. Only Officer Pickett spoke with Officer Bandyk at the SDSC. Officer Ponce recalled only that Officer Bandyk "was able to inform *Officer Ponce's vehicle*" of the suspended license. Officer Ponce's carefully worded statement is not that he learned the Camry's owner had a

---

[3] Although not central to the analysis in this case, the Court notes the important distinction between Jones's suspended license and Glover's revoked license. *See Glover*, 140 S.Ct. at 1192 ("the good reason the Court gives for thinking that someone with a revoked license will keep driving—that he has a history of disregarding driving rules—would no longer apply [to a suspended license]") (Kagan, J., concurring).

7

suspended license, but that "his vehicle" supposedly learned of this fact. The Court concludes that he means Officer Pickett supposedly learned of the suspended license because Officer Pickett was the one in Officer Ponce's vehicle who was communicating with Officer Bandyk. Officer Nunez's testimony further supports this conclusion. He did not remember who in the car was communicating with Officer Bandyk (nor even that Officer Bandyk was the officer speaking with Officer Pickett), and his testimony was confused as to which officers knew what information at the time. The government has not met its burden to show that Officers Ponce or Nunez had knowledge of any supposedly suspended license at the time of the search. The evidence therefore does not support that Officers Ponce and Nunez could have acted in objective reliance on information provided by others. That leaves Officer Pickett.

The Court does not find Officer Pickett's testimony on this point credible. First, the only officer that supposedly ran the Camry's license plate and determined whether its owner had a suspended license was Officer Bandyk. But Officer Bandyk does not recall running the license plate and does not recall whether she determined that the owner had a suspended license. These are key facts to forget given that Officer Bandyk remembered seeing what she believed was a gun; the address where she saw Jones; the make, color, and model of the car; and her phone call to Officer Pickett. Officer Bandyk also recalls that she provided a description of Jones, real-time location information, and the license plate number to the tactical officers, but does not recall if she provided any other information (e.g., whether the Camry's owner had a suspended license, FOID card, or CCL). Again, given the clarity in her memory around the rest of the information she provided the officers, Officer Bandyk's inability to recall researching and reporting a suspended license is peculiar if that was truly the basis for stopping Jones.

Second, no officer mentioned a suspended license during the stop. Instead, the BWC footage (collectively, 19 minutes of video and audio) shows the officers were singularly focused on

8

searching Jones for an illegal gun. No officer says anything whatsoever about a suspended license, though they have much to say about the gun. And when Jones asked Officer Pickett why he was stopped, Officer Pickett said *only* that they knew he had a gun. Officer Pickett's later testimony conflicts with the reasons he gave during the stop. At the hearing, Officer Pickett testified that he stopped and detained Jones for driving with a suspended license. Given the importance the officers now assign to Jones's suspended license, the Court is concerned with the entire lack of evidence that this was the officers' justification at the time of the stop.

Officer Pickett's inconsistency further illustrates the weakness of Officer Bandyk's statements. Officer Bandyk was unable to recall key details during her interview with the U.S. Attorney's Office. The Court will not speculate as to what her testimony would have been, but it is worth reiterating that she was not subject to cross-examination, which proved to cast significant doubt on key issues during Officers Pickett and Nunez's testimony. The Court weighs the testimony of testifying officers more heavily than the government's interview notes.

The Court therefore holds that the government has not proven by a preponderance of the evidence that the officers learned the Camry's owner had a suspended license at the time of Jones' detention, rather than after the fact. The evidence and testimony that the Court finds credible supports only that the officers stopped Jones to search for an illegal gun.

    b. *Possession of a Gun*

The Court therefore turns to the officers' suspicion about Jones's gun. This analysis is also controlled by the collective knowledge doctrine, *see Nafzger*, 974 F.2d at 911, as the only evidence that the police had for Jones's gun possession was Officer Bandyk's observation of Jones through the POD camera. There is no dispute that Officer Bandyk relayed to the tactical team that she saw a bulge in Jones's waistband, and that she believed the bulge was a gun. It is also clear that the tactical officers acted in objective reliance on the information Officer Bandyk provided about the gun: all

9

their testimony is aligned on this point, Officer Bandyk remembers relaying that information, and the discussion between the officers and Jones in the BWC footage bears this out. Therefore, the primary dispute here is whether Officer Bandyk (the officer providing the information) "had a reasonable suspicion to justify the stop." *Id.*

Jones argues that the object in his waistband, as depicted in the POD camera footage, is ambiguous and could be any number of legal objects. The government responds that the videos clearly show a gun, and that in any case, the shape of the bulge and the "high-crime area" in which Jones stood gave Officer Bandyk reasonable suspicion that Jones was armed. Again, although the area was deemed "high crime," the Court notes that the POD video merely depicts a small group of young men behaving amicably in a residential area in broad daylight. The Court has already raised its skepticism on the clarity of the POD video. *See supra* note 1. But the Court need not delve into this issue, as Jones succeeds on a related argument.

Jones also argues that, whether or not Officer Bandyk had reasonable suspicion that Jones had a gun, Officer Bandyk did not have reasonable suspicion that Jones possessed a gun illegally. Illinois law permits properly licensed citizens to carry concealed firearms. *See* 430 ILCS 66/1, *et seq.* In Illinois, having a concealed carry permit is an exception, not an affirmative defense, to the "unlawful use of weapons" statute. *See* 720 ILCS 5/24-1(a)(4)(iv). There is no evidence in the record that the officers knew whether the registered owner of the Camry had a CCL. And there is no evidence that they knew whether Jones had a CCL. Rather, both testifying officers confirmed that they did not know whether Jones had a FOID or CCL prior to stopping him as he exited his car, immediately handcuffing him, and searching the interior of his car.

The Seventh Circuit has not addressed whether a state's legalization of concealed carry affects the reasonableness of an officer's suspicion that mere possession of a firearm is evidence of a crime. Another district court in this circuit, however, has persuasively concluded that the Seventh

10

Circuit would likely hold that mere possession of a firearm, in a jurisdiction that allows concealed carry, is not enough to support reasonable suspicion of a crime under *Terry*. *See United States v. Winters*, No. 16-CR-146-JPS, 2017 WL 2703527, at *4–5 (E.D. Wis. June 22, 2017), *dismissed*, No. 17-2473, 2017 WL 6946245 (7th Cir. Sept. 19, 2017). The *Winters* court collected circuit court cases addressing the issue and determined that the Third, Fourth, Sixth, and Eighth Circuits have held "that a jurisdiction's legalization of gun possession, including concealed possession, eliminates those facts as a sufficient and independent basis for reasonable suspicion to satisfy the Fourth Amendment." *Id.* at *4 (citing *United States v. Jones*, 606 F.3d 964, 968–69 (8th Cir. 2010) (Loken, C.J., concurring); *United States v. Ubiles*, 224 F.3d 213, 217–18 (3d Cir. 2000); *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013); *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131–33 (6th Cir. 2015)). Other circuits, and the Third Circuit in a different case, have held that "observing a gun can support a valid *Terry* stop when the jurisdiction makes licensure an affirmative defense, holding that a stop can be used to resolve an ambiguity on the legality of an individual's gun possession." *Id.* (citing *United States v. Lewis*, 674 F.3d 1298, 1304–05 (11th Cir. 2012); *United States v. Briggs*, 720 F.3d 1281, 1287–88 (10th Cir. 2013); *United States v. Gatlin*, 613 F.3d 374, 378–79 (3d Cir. 2010)).

The *Winters* court then explained that it is likely the Seventh Circuit will follow the former group, based in part on the following guidance:

> [W]e note that the Supreme Court has made clear that the Second Amendment protects the individual right to keep and bear arms, *see District of Columbia v. Heller*, 554 U.S. 570, 635–36 ... (2008), and applies equally to the states through the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 791 ... (2010). And we have held that, subject to reasonable restrictions, the Second Amendment protects the right to carry a gun in public. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Considering these important developments in Second Amendment law together with Wisconsin's gun laws, we cannot accept the government's contention that the possibility of a gun in Leo's backpack posed a unique threat that justified a full search of the bag on less than probable cause. *See United States v. Williams*, 731 F.3d 678, 694 (7th Cir. 2013) (Hamilton, J., concurring in part and concurring in judgment) ("After *Heller* and *McDonald*, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking

11

>about these Fourth Amendment issues and how private possession of firearms figures into our thinking.").

*Leo*, 792 F.3d at 752.

The Court agrees with the *Winters* court's analysis. In jurisdictions where citizens can legally carry concealed weapons, the mere presence of a concealed weapon, without more, cannot support a reasonable suspicion that the suspect is illegally carrying that gun. Without any further evidence of criminality, any suspicion that a gun is illegally carried rather than legally carried could be based on nothing more than a mere hunch. *Bullock*, 632 F.3d at 1012.

The Court notes that this is a narrow rule. For instance, evidence suggesting that (1) the suspect is exhibiting "behavior [] unique to someone who [i]s unlawfully carrying a firearm," (2) the suspect does not in fact possess a concealed carry license, or (3) the suspect presents an immediate threat to the community, may provide the reasonable suspicion require to conduct a *Terry* stop. *See Winters*, 2017 WL 2703527, at *3–5. But none of those circumstances apply here. Officer Bandyk observed Jones doing nothing more than hanging out in a small group with a bulge concealed under his clothes. The group was not accused of any wrongdoing and was in fact simply talking and laughing in a public area. The officers agreed that Jones broke no traffic laws. No officer knew whether Jones had a FOID card or CCL when they stopped and detained him, and they did not ask him about any such license until after they handcuffed him and searched his legally parked vehicle.

Given the circumstances of this case, the officers' suspicion that Jones possessed a firearm illegally, rather than with a proper license, can only be characterized as a hunch. Their search therefore cannot satisfy *Terry*'s requirements.

2. *The Government's Remaining Arguments*

The government also argues that the officers' search was justified by the plain view and inevitable discovery doctrines. First, the Court rejects the government's plain view argument, as the evidence is barred as fruit of the poisonous tree. *See United States v. Patrick*, 842 F.3d 540, 546 (7th

12

Cir. 2016) (Wood, J., dissenting) ("if [defendant's] initial arrest was invalid, then the gun that the police spotted in plain view in the car should have been suppressed as 'fruit of the poisonous tree'") (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Even if that were not the case, the Court would reject the argument on its merits.

The Court does not find Officer Nunez's testimony that he saw the gun in plain view credible. On cross examination, Officer Nunez testified that he saw the gun wedged between the driver's seat and center console on his approach to the vehicle, yards away and through tinted glass. He opened the car door nearly immediately upon arriving at the car, with his body camera facing past the back of the vehicle. And Officer Nunez failed to mention in his police report that the gun had a SEAL switch. Yet he now claims the SEAL switch was the feature he immediately identified, and that a SEAL switch makes guns more dangerous and supports heightened criminal charges.

Second, the government cannot support the evidence of the gun through the "inevitable discovery doctrine." To succeed on this argument, the government must meet two criteria: "First, it must show that [the officers] had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the Government must demonstrate that [the officers] would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009) (footnote omitted). This is a high standard. To excuse the failure to obtain a warrant, the government must show "that a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008). Here, the officers' only reason for ultimately discovering that Jones had a suspended license (and thus impounding his car) was an impermissible search based on seeing Jones with what the officers believed to be a concealed gun. *Cf. Marrocco*, 578 F.3d at 638 (distinguishing a case in which the inevitable discovery doctrine applied with "a case where the investigating officers learned new information during an illegal search and, based on that

13

information, took investigatory steps that they would not have taken otherwise."). The officers were not independently looking for drivers with suspended licenses. Without the crucial decision to follow Jones to his car based on the suspicion that he possessed an illegal weapon, there is no evidence that the officers would have independently followed Jones's car, discovered that Jones's license was suspended, and impounded the car. Therefore, the government cannot support its use of the gun as evidence through the inevitable discovery doctrine.

**Conclusion**

The officers were ultimately correct on their hunch that Jones possessed a firearm without a license. But the Fourth Amendment does not permit police the benefit of hindsight. At the time the police stopped Jones, immediately handcuffed him, and searched his car, they knew very little: a distant camera operator reported that an approximately 30-year-old male had a bulge under his clothes. Jones was not otherwise suspected of any wrongdoing, aside from gathering with an apparently amicable group in a public place deemed a "high crime area." Yet without any knowledge of whether that gun was legally possessed, the camera operator followed Jones's car for nearly two miles through cameras positioned in other "high crime areas" of the city until the police apprehended Jones and immediately searched his legally parked car. For the reasons explained above, that search was not supported by reasonable suspicion. The Court therefore grants Defendant's motion to quash arrest and suppress evidence [30].

**IT IS SO ORDERED.**

Date: 12/22/2023

Entered:

SHARON JOHNSON COLEMAN
United States District Judge

14